NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SHOREN VENTURES LLC d/b/a PREMIERE CREATIVE, <br><br> Plaintiff, <br><br> v. <br><br> FREIDA ROTHMAN LLC, <br><br> Defendant. | Civil Action No. 21-15544 (SRC) <br><br> **OPINION & ORDER** |

**CHESLER**, District Judge

  This matter comes before the Court on Plaintiff's motion for summary judgment and Defendant's motion for partial summary judgment. The Court has reviewed the papers and proceeds to rule on the motions without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, Plaintiff's motion for summary judgment will be denied, and Defendant's motion for partial summary judgment will be granted, in part, and denied, in part.

  I.  **BACKGROUND**

  Plaintiff's complaint contains two counts, styled "Breach of Contract/Book Account/Unjust Enrichment" (Count One) and "Collection/Attorney's Fees" (Count Two). Compl. at ¶¶ 7-33.

  On or about November 4, 2020, the parties entered into an agreement pursuant to which Plaintiff would provide digital marketing services to Defendant. Id., Ex. A at 1. The marketing services largely pertain to two areas: (1) strategies for the acquisition and retention of

1

subscribers and customers for email marketing and (2) management of pay-per-click ("PPC") advertising campaigns to "fine tune and improve the CTR (click thru rate) and thus reduce [Defendant's] price per click." Id. at 2-3. Two sets of "annual fees" are listed for email marketing services, one of which is struck through. Id. at 2. The struck-through set lists fees of $35,000 and $300,000; the set to its right fees of $16,500 and $120,000. Id. The agreement calls for Defendant to pay Plaintiff annual and startup fees for PPC advertising services, as well as 10% commissions on "Klaviyo Emails and Flows"[1] and "Google PPC" for any month in which Defendant's revenues in either category were three times higher than Plaintiff's "monthly agency fees." Id. at 2-3, 5. Furthermore, Plaintiff was to spend a minimum of $15,000 per month on "Google PPC" services, "plus or minus 10%, for 12 months, totaling $180,000."[2] The agreement provides for a monthly payment schedule running from November 2020 to October 2021. Id. at 4.

Central to the parties' agreement is Defendant's return on advertising spend ("ROAS"), calculated monthly by dividing Defendant's revenue by Plaintiff's fees. Indeed, the agreement grants Defendant a right to early termination if the ROAS fails to meet certain benchmarks:

> **Termination of Annual Agreement after the Start up Phase:**
> FreidaRothman requires a weighted average ROAS of 2.0 over the first three months of this agreement. If the ROAS is below 2.0 after month three of the agreement, FreidaRothman reserves the right to terminate the Annual agreement as detailed in the Premier Creative Terms & Conditions. …

---

[1] Klaviyo is, according to Plaintiff, "an automated e-mail system which engages customers to return to a website following a visit through which a purchase did not immediately occur." Abbot Cert. at ¶ 17.

[2] Id. at 7-8. The agreement further provides that, "[i]n the event[] the ROAS falls or appears to be falling below 3.0, Premiere may not chose to reduce the monthly Google PPC spend in order to secure their 3.0 ROAS commission without approval from FreidaRothman. Likewise FreidaRothman may not reduce the $15,000/month Google budget to limit Premiere from achieving their 3.0 ROAS Agency Commission." Id.

> **Termination of Annual Agreement after the First Three Months and Beyond:** At any time during the 1st year agreement, if the trailing three months, starting at month 3 falls below schedule the three month rolling average, FreidaRothman reserves the right to terminate this Annual agreement as detailed in Premiere Creative Terms & Conditions upon written notice with 30 days.

Id. at 6.

The minimum "weighted average" ROAS climbs from 200% in month three, to 233% in month four, 266% in month five, and 300% for months six through twelve. Id. The agreement grants Defendant the "right to exclude any revenues generated by [its] third party network of stylists" from monthly revenue calculations. Id. at 7.

The remainder of the agreement consists of a "Terms and Conditions" section in which Plaintiff is the "Seller" and Defendant the "Buyer." Paragraph four addresses payment of invoices, late fees, and credits:

> Invoices are due upon receipt. The first time that an invoice is paid late, the Buyer shall be charged a late fee in an amount equal to ten percent (10%) of that invoice. For each time thereafter that an invoice is paid late, the Buyer shall be charged a late fee in an amount equal to fifteen percent (15%) of that invoice. Buyer shall be responsible for all costs and expenses, including without limitation attorneys' fees, collection fees, court costs, collection agency's fees, and disbursements incurred by Seller to collect any amounts due from Buyer under this Agreement. In the event that Seller has provided credits or barter on invoices to Buyer and Buyer fails to pay such invoices when due, Buyer forfeits such credit and the full amount shall be due and payable without setoff or deduction.

Id. at 9.

Paragraphs 8.1 and 8.2 concern each party's termination rights. Paragraph 8.1 is partially struck through:

3

> This Agreement may be paid in monthly installments ~~but cannot be cancelled~~ and fees are non-refundable. ~~In the event that Buyer provides notice of its intent to terminate this Agreement prior to expiration of the Term, such notice of termination shall not relieve Buyer of the obligations to pay in full all sums due and owing to Seller as set forth in the Quote for the entire Term.~~ …
>
> Seller may terminate this Agreement at any time upon thirty (30) days advance written notice ("Termination for Convenience") to Buyer or immediately upon notice in the event of Default. … The following shall constitute an event of Default: (a) failure to pay all or any part of any invoice when due, (b) failure to observe or faithfully perform any of its obligations under this Agreement, or (c) [bankruptcy or insolvency]. If Buyer is unable to or fails to commence taking reasonable steps to cure an event of Default within thirty (30) days of the date of Seller's notice, then this Agreement shall terminate immediately and all sums due or about to become due from Buyer to Seller shall become immediately due and payable. …

Id. at 11-12. Moreover, paragraph thirteen states that "Buyer agrees to indemnify, defend and hold harmless the Seller … from and against any claim, liability, obligation, loss, damage, judgment, cost or expense, including reasonable attorney's fees suffered or sustained that in any way relates to … any breach or default by Buyer under any representation, warranty, covenant or other provision of this Agreement." Id. at 13.

## II.  DISCUSSION

Federal Rule of Civil Procedure 56(a) sets the standard the Court must apply to the parties' motions for summary judgment. Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)). It is well-established that a

4

factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and material if, under the substantive law, the dispute would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'" Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). The Court may not make credibility determinations or engage in any weighing of the evidence. Anderson, 477 U.S. at 255; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

Once the moving party has satisfied its initial burden, the nonmoving party must establish the existence of a genuine issue as to a material fact in order to defeat the motion. Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985). To create a genuine issue of material fact, the nonmoving party must come forward with sufficient evidence to allow a jury to find in its favor at trial. Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs, 134 S. Ct. 773 (2014). The party opposing a motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; see also Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

### A. Plaintiff's Motion for Summary Judgment

Plaintiff seeks judgment against Defendant in the amount of $478,070.61. Pl. SOF at ¶ 1. Plaintiff submits the parties' agreement constitutes "a written contract," executed "following

5

extended negotiations between September 2020 and November 4, 2020." Id. at ¶ 3. Plaintiff argues it performed as required under the contract, and Defendant "accepted Plaintiff's work, services and intellectual property without payment and conducted 'lock outs' to retain the benefits derived from Plaintiff's extended efforts." Id. at ¶¶ 6, 8. Thereafter, Plaintiff asserts it "re-issued its invoices to revoke credits and discounts as provided in the agreement between the parties." Id. at ¶ 9. In conjunction with the unpaid invoices totaling $398,392.18, Plaintiff seeks an award of attorney's fees in the amount of $79,678.43, or 20% of $398,392.18. Abbot Cert. at ¶¶ 5-8. Plaintiff's Creative Director, J.J. Abbot ("Abbot"), recounts that Defendant's Director of E-Commerce, Sundeep Arya, "kept detailed track of . . . revenues, ROAS calculations, service fees, comparison, and historical data." Id. at ¶ 22. Abbot implies that Defendant's ROAS calculations were inaccurate and submits that "unvarnished results demonstrate positive income for Defendant which exceeded ROAS [requirements]." Id. at ¶ 24.

Defendant counters that, "on or about March 11, 2021," it properly exercised its early termination rights under the agreement upon finding that Plaintiff "failed to achieve the minimum ROAS requirements." Def. Opp. Br. at 4-5. Specifically, Defendant calculated that "the minimum ROAS … at the end of February 2021 was $239,990 ($103,000 x 2.33)," and with revenues of $213,626, "Plaintiff was $26,364 short of meeting the 233% ROAS." Id. (quoting DePalma Decl., Ex. B). Furthermore, Defendant argues that Plaintiff disputes its ROAS calculations without providing "alternative evidence of [Plaintiff's] version of the revenues," and points to Abbot's deposition testimony that Plaintiff no longer has access to data used to calculate the ROAS. Id. at 5-6 (citing T29:13-18).³ Second, Defendant contends Plaintiff breached its obligation to spend $15,000 per month on Google PPC, plus or minus 10%.

---

³ "T" refers to Abbot's deposition transcript, attached to the DePalma Declaration as Exhibit C.

Specifically, Defendant claims that "in January and February 2021 Plaintiff grossly underspent on Google PPC in the amounts of $2,777 and $3,225 respectively." Id. at 6 (citing DePalma Decl., Ex. B). Third, Defendant advances that "Plaintiff failed to achieve a minimum ROAS of 3.0 (or 300%) necessary to receive a commission for December 2020," and "a question of material fact exists on this issue precluding summary judgment." Id. at 14.

At the outset, the Court notes the key facts not in dispute. First, Plaintiff asserts, and Defendant does not dispute, that the parties validly entered into, and are bound by, the agreement at issue.[4] Second, they do not dispute that, consistent with the agreement's choice of law provision, the law of the State of New Jersey governs the agreement. Third, they do not dispute that the agreement granted Defendant a right to early termination if its revenues did not exceed its expenses by a certain percentage, the ROAS.

New Jersey law requires four elements to establish a breach of contract claim: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007); see also Globe Motor Co. v. Igdalev, 139 A.3d 57, 64 (N.J. 2016).

Here, neither the contract nor New Jersey law support Plaintiff's position that it is entitled to summary judgment on Count One. Viewing the evidence in the light most favorable to Defendant, a reasonable jury could find that Plaintiff failed to achieve the minimum average ROAS for February 2021, and Defendant properly exercised its early termination rights.

---

[4] As such, Plaintiff cannot pursue a claim of unjust enrichment. Unjust enrichment is only an avenue for recovery when the underlying dispute is not governed by a valid contract. See Wanaque Borough Sewerage Auth. v. Twp. of W. Milford, 144 N.J. 564, 574 (1996); see also Van Orman v. Am. Ins. Co., 680 F.2d 301, 310 (3d Cir. 1982). Similarly, Plaintiff cannot pursue a book account claim because such claim is duplicative of the breach of contract claim. See Fintech Consulting v. ClearVision Optical Co., No. 12-CV-4956 DMC JAD, 2013 WL 1845850, at *5 (D.N.J. Apr. 30, 2013). Therefore, the Court construes Count One as a claim for breach of contract alone.

Included among Plaintiff's exhibits is a spreadsheet titled ECOMM SALES YOY[5] that Defendant claims reflects minimum expenses of $103,000 and revenues of $213,626 from December 2020 to February 2021, for a rolling average ROAS of 2.07, below the minimum 2.33. See P356-381. Plaintiff disputes the accuracy of Defendant's revenue calculations, asserting that "unvarnished results demonstrate positive income for Defendant which exceeded ROAS," but as evidence points only to a version of Defendant's ECOMM SALES YOY spreadsheet labeled "YOY Agency DO NOT USE." See P369. This document, however, contains "TOTAL WEB" revenue calculations for January and February 2021 that mirror those on Defendant's ECOMM SALES YOY spreadsheet. Id. Therefore, Plaintiff has not carried its burden of demonstrating that "there is no genuine issue as to any material fact and [it] is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).

Having found a genuine dispute of fact as to Defendant's alleged breach of contract, the Court must also deny Plaintiff's motion for summary judgment on Count Two, which seeks an award of attorney's fees pursuant to the agreement's indemnification clause. A finding of breach or default is a prerequisite to recovery of attorney's fees under the contract. See Compl., Ex. A at 13 ("Buyer agrees to indemnify, defend and hold harmless the Seller … including reasonable attorney's fees suffered or sustained that in any way relates to … any *breach or default* by Buyer.") (emphasis added).

---

[5] The Court notes that the ECOMM SALES YOY spreadsheet in Plaintiff's exhibits is spliced across multiple pages, leaving expense and revenue figures for the relevant time period difficult, if not impossible, to discern. The ECOMM SALES YOY spreadsheet is also attached to Abbot's deposition transcript, but presents similar ambiguities that would be inappropriate for the Court to attempt to resolve at this juncture. See DePalma Decl., Ex. C. Indeed, the Court cannot engage in weighing of evidence and credibility determinations in evaluating a motion for summary judgment.

Therefore, because there is a genuine issue of material fact as to whether Defendant properly exercised its early termination rights, Plaintiff's motion for summary judgment is denied.

**B. Defendant's Motion for Partial Summary Judgment**

Defendant's motion seeks summary judgment on three issues: "(1) Plaintiff's claims for post-termination contractual damages; (2) Plaintiff's claims for contractual forfeiture credits in the amount of $198,000; and (3) Plaintiff's claims for contractual late fees." Def. Notice of Motion.

The parties do not dispute that, after defendant terminated the agreement, Plaintiff invoiced it "for the entire year's worth of Google [PPC] Services … in the amount of $60,000" (Invoice #4319). Def. SOF at ¶ 17; see Compl., Ex. B at 4. Plaintiff also invoiced Defendant "for the entire year's worth of Klaviyo [Email Marketing] Services … in the amount of $120,000" (Invoice #4318), and the "entire annual fee of $16,500 for 'Design/program automation & segmentation'" (Invoice #4316). Def. SOF at ¶ 21; see Compl., Ex. B at 2-3. Invoice #4338 bills a "December Commission 10% based on revenues of $122,137." Compl., Ex. B at 1. Defendant asserts these invoices all contain late fees totaling $52,178.43 and one "short fall" charge of $2,500. Def. SOF at ¶¶ 28-29. Invoices #4316 and #4318 charge Defendant an additional $18,500 and $180,000, respectively, as forfeited credits, citing the agreement's terms and conditions. Id. at ¶¶ 25, 27; see Compl., Ex. B at 2-3.

Defendant asserts these invoices are "[t]he only invoices produced in discovery," and "the only records of invoices Plaintiff has to support its claims." Def. SOF at ¶¶ 49-50. Defendant contends these invoices simultaneously charge both a first and second late fee, contravening the agreement, which calls for separate billing of the first and any subsequent late

9

fees. Def. SOF at ¶¶ 48-19. Next, Defendant argues that "[n]owhere in the [c]ontract does it expressly state that [Defendant] received any form of credit whatsoever," and that the agreement does not "expressly state" that the two sets of annual fees for email marketing services, one with a strikethrough and one without, were a credit. Id. at ¶¶ 44, 46. Defendant further argues that while the agreement does call for forfeiture of credits provided on invoices, the credits at issue are not on invoices, but rather "simply a result of contractual negotiations whereby [Defendant] negotiated Plaintiff's [] price[s] down." Def. Br. at 13-15.

As to Plaintiff's invoices for its annual fees for Klaviyo services, Google PPC services, and "design/program automation & segmentation," Defendant argues Plaintiff "has only submitted improper evidence of gross revenues in support of its claim for damages," when evidence of lost profits—gross revenues less expenses—is required to recover those fees. Id. at 5-7. Defendant submits that allowing Plaintiff to recover the annual fees "would place [] Plaintiff in far greater position than if it had completed the [c]ontract." Id. at 10-11. Likewise, Defendant contends the lack of lost profits evidence prevents Plaintiff from recovering late fees on the annual fee invoice charges and bars Plaintiff's claim for forfeited credits. Id. at 15.

Plaintiff responds that "[t]he proper measure of damages constitutes reversal of the discounted pricing as provided in the contract," and that it has carried its burden of proof by "provid[ing] a contract and precise calculation of damages based on the parties' written agreement." See Pl. Opp. Br. at 4. In essence, Plaintiff emphasizes that the contract speaks for itself, and no outside evidence is required: "Plaintiff['s] losses are measured in the discounts afforded based on its policy to allow payments over time and future commissions on ROAS … [t]he [damages] are not speculative or unreasonable but set forth in the heavily negotiated contract …." See id. at 5. Plaintiff asserts it is unable to provide lost profits evidence because

Defendant conducted "lock-outs" on March 16, 2021 and March 24, 2021 that "deprived [Plaintiff] of the ability to review lost profits based on revenues earned" and "prohibited … visibility into these financial aspects of Defendant's operations." See Abbot Cert. at ¶¶ 8-9.

### 1. Plaintiff's claims for "post-termination contractual damages"

When interpreting a contract under New Jersey law, a court must "examine the plain language of the contract and the parties' intent, as evidenced by the contract's purposes and surrounding circumstances." State Troopers Fraternal Ass'n of N.J., Inc. v. State, 692 A.2d 519, 523 (N.J. 1997). In undertaking this task, a court reads the contract "as a whole and in a fair and common sense manner." Hardy ex rel. Dowdell v. Abdul-Matin, 965 A.2d 1165, 1169 (N.J. 2009). "[A] court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the 'expressed general purpose.'" Pacifico v. Pacifico, 920 A.2d 73, 77 (N.J. 2007) (quoting Atl. N. Airlines, Inc. v. Schwimmer, 96 A.2d 652, 656 (N.J. 1953)). "The interpretation or construction of a contract is usually a legal question for the court, 'suitable for a decision on a motion for summary judgment.'" Driscoll Const. Co., Inc. v. State, Dept. of Transportation, 853 A.2d 270, 276 (N.J. Super. App. Div. 2004) (quoting Spaulding Composites Co., Inc. v. Liberty Mut. Ins. Co., 787 A.2d 238, 241 (N.J. Super. App. Div. 2001), rev'd on other grounds sub nom. Spaulding Composites Co., Inc. v. Aetna Cas. and Sur. Co., 819 A.2d 410 (N.J. 2003)).

Here, the contract provides that upon "an event of Default," defined in relevant part as a "failure to pay all or any part of any invoice when due or failure to observe or faithfully perform … [contractual] obligations," "within thirty (30) days of the date of Seller's notice, [] this Agreement shall terminate immediately and *all sums due or about to become due from Buyer to Seller shall become immediately due and payable*." Compl., Ex. A at 11-12 (emphasis added).

The agreement does not expressly require written notice upon "an event of Default," and does not specify any further procedural or content requirements for such notice. Construing the evidence in Plaintiff's favor, a reasonable factfinder could conclude it satisfied its notice obligation by invoicing Defendant its annual fees and forfeited credits after Defendant's termination—or, as Plaintiff alleges, breach—of the agreement. In any event, Defendant bears the burden of proof to show this clause, which could reasonably and rationally be read to permit Plaintiff to recover its annual fees, is inapplicable here. Nonetheless, Defendant's motion papers fail to address the issue. Given the plain language of the agreement, lost profits evidence is not required here. See Pacifico, 920 A.2d at 77.

As the Court has found a genuine issue of material fact as to whether Defendant properly exercised its early termination rights, it follows that there must also be an issue of fact as to whether Plaintiff can recover its annual fees as "sums due or about to become due," minus any monthly payments Defendant made. See id.; Nelson v. Elizabeth Bd. of Educ., 246 A.3d 802, 812 (N.J. Super. App. Div. 2021) ("The goal in awarding damages is 'to put the injured party in as good a position as ... if performance had been rendered.'") (quoting Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C., 921 A.2d 1100, 1108 (N.J. 2007)).

Therefore, Defendant's motion for summary judgment as to Plaintiff's claim for "post-termination contractual damages" is denied.

### 2. Plaintiff's claims for contractual forfeiture credits

Courts typically are limited to the "plain, ordinary meaning" of contractual terms. Pizzullo v. New Jersey Mfrs. Ins. Co., 952 A.2d 1077, 1088 (N.J. 2008). Moreover, "[w]here the parties have made the writing the sole repository of their bargain, there is the integration which precludes evidence to antecedent understandings and negotiations to vary or contradict the

12

writing. This is in essence the 'parol evidence rule ....'" A. N. Airlines v. Schwimmer, 96 A.2d 652, 657 (N.J. 1953). Whether a written instrument is fully integrated "depends wholly upon the intent of the parties; but the intent must be judged by an external standard." Id.

The parties' agreement provides that, "[i]n the event that Seller has provided *credits* or barter on invoices to Buyer and Buyer fails to pay such invoices when due, Buyer forfeits such *credit* and the full amount shall be due and payable without setoff or deduction." Compl., Ex. A at 9 (emphases added). Neither party has argued the contract is not a fully integrated representation of the parties' agreement. Rather, both sides submit the contract is the final, sole product of months-long negotiations, see Pl. SOF at ¶ 3; Def. Br. at 13-15, and the document itself reveals no hint that it precedes or succeeds an external accord. Thus, the Court's interpretation of the contract's relevant term— "credit"[6]—is limited to its plain, ordinary meaning. See Pizzullo, 952 A.2d at 1088.

As to the two sets of prices for Plaintiff's annual email marketing fees, there is nothing in the contract to create a genuine issue of fact as to whether the set with the strikethrough reflects a credit towards monthly invoices, to be recouped in the event of Defendant's failure to pay. Though Plaintiff certifies the reduced annual fees are a credit, it offers no viable support for that assertion and even concedes that "Defendant negotiated a substantially reduced price for [Plaintiff's] services." See Abbot Cert. at ¶¶ 6, 10. Plainly, a reasonable jury could not conclude Plaintiff issued a credit for its annual email marketing fees based on the strikethrough alone, particularly when viewed in context of the entire agreement, of which entire paragraphs and portions of sentences are struck through. The strikethrough on the annual email marketing fees is

---

[6] Credit is typically defined as, *inter alia*, "a deduction from an amount otherwise due." Credit, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/credit (last visited Sept. 26, 2023).

entirely consistent with its use throughout the contract as a roadmap for the negotiation of the parties' final, set terms. Therefore, Defendant has shown the absence of a genuine issue of material fact as to whether Plaintiff can recover its alleged "contractual forfeiture credits."

For the foregoing reasons, Defendant's motion for summary judgment is granted as to Plaintiff's claims for "contractual forfeiture credits" in the amounts of $180,000 and $18,500.

### 3. Plaintiff's claims for contractual late fees

The parties do not dispute that the only invoices Plaintiff produced in discovery are Invoice #4338, Invoice #4316, Invoice #4318, and Invoice #4319. Each invoice charges Defendant a first and second late fee; three of the four invoices list December 2020 and January 2021 as the dates Plaintiff assessed the late fees, while the late fees in Invoice #4338 contain no dates. Compl., Ex. B at 1-4. Invoices #4316, 4318, and 4319 bill Defendant the annual fees for Plaintiff's marketing services, whereas Invoice #4338 seeks a commission payment for December 2020. Id. at 1-4. Invoice #4338 is dated January 1, 2021; the remaining invoices are dated November 4, 2020. Id. Defendant has asserted, and Plaintiff has admitted, that these invoices are "the only records of invoices Plaintiff has to support its claims." Def. SOF at ¶ 50; Pl. Counter-SOF at ¶ 50. Furthermore, the parties do not dispute that Plaintiff updated the invoices "to include the forfeiture credits on or about April 3, 2021." Def. SOF at ¶ 54; Pl. Counter-SOF at ¶ 54.

The agreement states as follows:

> Invoices are due upon receipt. The first time that an invoice is paid late, the Buyer shall be charged a late fee in an amount equal to ten percent (10%) of that invoice. For each time thereafter that an invoice is paid late, the Buyer shall be charged a late fee in an amount equal to fifteen percent (15%) of that invoice.

Compl., Ex. A at 9.

Although Invoices #4316, 4318, 4319, and 4338 are the only invoices Plaintiff has produced in discovery, and the agreement plainly and unambiguously prohibits Plaintiff from concurrently assessing a first and second late fee, there are nevertheless genuine issues of material fact as to when these invoices were first issued and what edits Plaintiff thereafter made to them. For example, Plaintiff has admitted it added the charges for forfeiture credits in April 2021, well after the November 4, 2020 date on those invoices. Plaintiff has likewise admitted it issued Invoice #4316 with a charge for its annual "[d]esign/program automation & segmentation" fee after Defendant terminated the agreement. Def. SOF at ¶ 24; Pl. Counter-SOF at ¶ 24. Most notable, however, is Plaintiff's response to Defendant's Interrogatory #13, which claims that Defendant made *eleven* late payments on invoices between November 2020 and January 2021. Def. SOF at ¶ 37 (quoting DePalma Decl., Ex B). Defendant has not disputed this allegation. These discrepancies forestall summary judgment on this issue.

In the alternative, Defendant seeks "entry of partial summary judgment obligating Plaintiff to credit [Defendant] for payments of $67,250 before any late fees are assessed against any balance due found in the trial of this matter." Def. Br. at 19. Although the parties do not dispute that Defendant paid Plaintiff $67,250 "through to February 18, 2021," Defendant has not alleged facts or produced any evidence whatsoever establishing that such payments were timely under the agreement. Defendant is not entitled to summary judgment on this issue, however, as the Court has previously stated, any recovery of alleged credits or annual fees must be less any payments Defendant made towards the annual fee to which the credit applies. See Nelson, 246 A.3d at 812. The same principle applies to recovery of late fees assessed against such charges. See id.

Therefore, Defendant's motion for summary judgment is denied as to this issue.

### III. CONCLUSION

For the reasons discussed, genuine issues of material fact preclude Plaintiff from satisfying the Rule 56(a) burden of obtaining summary judgment on any portion of its respective motion. Defendant, on the other hand, has demonstrated the absence of a genuine issue of material fact as to Plaintiff's claims for "contractual forfeiture credits" in the amounts of $180,000 and $18,500, and is entitled to summary judgment on that issue. Nevertheless, genuine issues of material fact bar summary judgment on all remaining issues raised in Defendant's motion.

Therefore, **IT IS** on this 27th day of September, 2023,

**ORDERED**, as follows:

1. Plaintiff's motion for summary judgment is denied;
2. Defendant's motion for partial summary judgment is granted in part, only as to Plaintiff's claims for "contractual forfeiture credits" in the amounts of $180,000 and $18,500; and
3. Defendant's motion for partial summary judgment is denied as to all remaining issues.

/s/ Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge